IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JANET MILLER, *et al.*,

     *Plaintiffs*,

     v.

MARKWAYNE MULLIN,[1]

     *Defendant*.

Civil No.: 1:25-cv-00703-JRR

## MEMORANDUM OPINION

Pending before the court is Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment.[2] (ECF No. 33; the "Motion"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons set forth below, by accompanying order, the Motion, construed as a motion to dismiss, will be granted.

## I.    BACKGROUND[3]

### A.  Factual Background

Plaintiffs Janet Miller and Alexis Burroughs are African American female employees of the U.S. Citizenship and Immigration Services ("USCIS" or the "Agency"), a component of the Department of Homeland Security ("DHS"). (ECF No. 1 ¶¶ 12, 15.) Beginning May 2013, and at all times relevant, Ms. Miller worked as an Information Technology ("IT") Program Manager ("PM") in the USCIS Office of Information Technology ("OIT"). *Id.* ¶ 12. Similarly, beginning November 2011, Ms. Burroughs began working in USCIS OIT as an IT PM, and in 2014, she began working in the Systems Delivery Division ("SDD") of OIT as an IT PM. *Id.* ¶ 15.

---

[1] The individual public officer Defendant has since changed. Pursuant to Federal Rule of Civil Procedure 25(d), Madam Clerk shall substitute Alejandro Mayorkas (and Kristi Noem) for Markwayne Mullin.

[2] Although Defendant's Motion is titled "Motion to Dismiss," it seeks alternative relief per Rule 56. The court assesses it accordingly.

[3] For purposes of resolving the Motion, the court accepts as true all well-pled facts set forth in the Complaint. (ECF No. 1.) *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

Plaintiffs assert that in 2014, Ms. Burroughs "pioneered the implementation" of a program titled System for Tracking Activities, Relationships, and Services ("STARS"). (ECF No. 1 ¶ 18.) Ms. Miller joined the project team in 2016. *Id.* ¶ 19. Together, Plaintiffs oversee the STARS program and have similar duties, which include providing "enterprise portfolio leadership, coordination, and communication across 15 USCIS offices and programs overseeing the development and implementation of 17 different applications." *Id.* ¶ 18. Plaintiffs assert their positions do not require them to directly supervise other federal employees but do require oversight of federal contractors by managing relevant contracts to ensure the STARS program runs smoothly. *Id.* In addition to these duties, Ms. Burroughs serves as the Contract Manager for the program, "overseeing the life cycle of the multi-million-dollar service and license contracts." *Id.*

Plaintiffs allege they experienced numerous acts of discrimination by "management" and "supervisors" during the period 2018 to 2021. (ECF No. 1 ¶ 21–51.) Plaintiffs assert their managers are the Division Chief and Deputy Division Chief. *Id.* ¶ 49. Plaintiffs describe their immediate supervisory chain as follows: Division Chief Paula Wagner (a white woman); Deputy Division Chief Christopher Wallace (a white man); and Former Acting Branch Chief Ariana Amparan (a white woman).[4] *Id.* ¶ 20. For ease of reference, the court sets out below the alleged incidents in chronological order.

Ms. Miller alleges her personal performance rating was lowered without justification on October 19, 2018. (ECF No. 1 ¶ 28.)

From December 2018 to approximately 2021, "management denied Plaintiffs' requests for additional staffing." *Id.* ¶ 21. Plaintiffs requested additional staff for the STARS team "in

---

[4] Plaintiffs assert the Branch Chief is their direct supervisor and the Division Chief is their second level supervisor. (ECF No. 1 ¶ 20.) They contend these above-named supervisors committed the alleged discriminatory acts against them. *Id.*

line with Balanced Workforce Standards,"[5] but were denied additional staff "unlike their white peers." *Id.* When Ms. Burroughs informed her supervisors the staffing profile for the STARS team failed to meet Balanced Workforce Standards, she was "maligned" by her supervisors "for not meeting standards." *Id.* ¶ 22. During this period, Ms. Miller was also harassed by management "for not meeting impossible standards which would have required many additional employees in her unit." *Id.* ¶ 23.

As a result of being understaffed, Plaintiffs were forced to work significant overtime hours, which were uncompensated. *Id.* ¶ 21. Accordingly, from November 2018 through the date Plaintiffs filed the instant action (November 1, 2023), Plaintiffs allege they were discouraged by management from requesting compensatory time for the hours they were forced to work in overtime. *Id.* ¶ 24.

From approximately February 2018 to February 2019, Plaintiffs were also denied a Cybersecurity Retention Incentive ("CRI") bonus. (ECF No. 1 ¶ 25.) Plaintiffs were the only eligible employees denied the CRI bonus that year and they were the only African American women in their group. *Id.* ¶ 26. Plaintiffs received the CRI bonus for the following year only after submitting formal justifications for their entitlement, which their white coworkers were not required to submit. *Id.* And when Ms. Burroughs spoke to her supervisors regarding the CRI bonus denial, Plaintiffs contend, Division Chief Wagner "chastised and ridiculed" her. *Id.* ¶ 27.

In approximately June 2020, Ms. Amparan was hired to a position within Plaintiffs' branch and joined the STARS team as Plaintiffs' coworker. (ECF No. 1 ¶ 30.) Plaintiffs allege Ms. Amparan was given preferential treatment in the hiring process, while other African American employees were discouraged from applying, or not given the necessary information

---

[5] The Complaint does not define Balanced Workforce Standards and merely notes they are "federal standards." (ECF No. 1 ¶ 22.)

to apply, for the position.[6]  *Id.*  Plaintiffs contend the selection of Ms. Amparan hindered their department's operations because more qualified candidates—including African American candidates—were available to assist their team.  *Id.*  After Ms. Amparan became Plaintiffs' coworker, Ms. Amparan began criticizing and undermining their work, as well as excluding them from discussions and decision-making.  *Id.* ¶ 31.  From the time Ms. Amparan was hired to February 28, 2021, Plaintiffs allege management directed Ms. Amparan to assess and scrutinize Plaintiffs without their knowledge.  *Id.* ¶ 29.

On October 19, 2020, Ms. Amparan was promoted by management to become the Acting Branch Chief, Plaintiffs' direct supervisor.  (ECF No. 1 ¶ 32.)  Plaintiffs claim Ms. Amparan was also selected for this position without the requisite qualifications, despite Plaintiffs' "seniority and experience" within the department.  *Id.*  Plaintiffs were not given an opportunity to apply for the Acting Branch Chief position.  *Id.*  Subsequently, Ms. Burroughs complained to Deputy Division Chief Wallace who made "degrading" comments to Ms. Burroughs and stereotyped "her as a [B]lack woman who was overly emotional or too aggressive."  *Id.* ¶ 34.  Ms. Burroughs also met with Division Chief Wagner to discuss her complaints, who, Plaintiffs assert, dismissed her complaints as "feelings."  *Id.* ¶ 34.

On December 18, 2020, Plaintiffs allege Ms. Amparan, serving as their direct supervisor at the time, sent Plaintiffs, the only two African American employees in their branch, a message that included an emoji of a monkey.  (ECF No. 1 ¶ 36.)  At a subsequent meeting among Plaintiffs and Ms. Amparan on January 27, 2021, Plaintiffs discovered that Ms. Amparan had been placed on the STARS team to personally assess them and that "Ms. Amparan had sent the monkey emoji to them with awareness of the discriminatory nature of

---

[6] The Complaint identifies the two African American employees as Brian Glover and Emma Wright but does not address whether they were coworkers of Plaintiffs or worked within their department.  (ECF No. 1 ¶ 30.)

such an image." *Id.* ¶¶ 39–40.  Ms. Miller alleges she did not notice the emoji at the time it was sent and only learned about the emoji after the January 2021 meeting.  *Id.* ¶ 37.

Plaintiffs both initiated contact with USCIS's Office of Equal Opportunity and Inclusion (the "EEO Office") within 45 days of the January 2021 meeting.  (ECF No. 1 ¶ 40.) Plaintiffs allege discriminatory treatment by their supervisors, namely Ms. Wagner, Mr. Wallace, and Ms. Amparan, continued after their contact with the EEO Office.  *Id.* ¶¶ 42–44.

On two subsequent occasions, beginning February 26, 2021, Plaintiffs allege they were once again passed over for promotion to Acting Branch Chief of Mission Support without being given the opportunity to apply for the position.  (ECF No. 1 ¶ 45.)  In both instances, white women were selected as Acting Branch Chief.[7]  *Id.* ¶¶ 45, 49.  Kim Rae Valentine (a white woman) was ultimately selected by management as the permanent Branch Chief.  *Id.* ¶ 49.

From September to October 2021, Plaintiffs further allege that management divested them of certain responsibilities with regard to the STARS team, effectively terminating their leadership roles, and removed them from the Integrated Project Team.  (ECF No. 1 ¶ 46.) Plaintiffs allege the substantial decrease in their respective duties during this period constituted retaliation for filing discrimination complaints.  *Id.* ¶ 50.

Days prior to her performance review scheduled for October 15, 2021, Ms. Burroughs alleges she was informed the officials performing her review would be changed; she asserts her subsequent performance rating was "lower than she deserved."  *Id.* ¶ 48.

Finally, Plaintiffs allege they were discriminated against on the basis of their sex[8] because their white managers (Ms. Wagner and Mr. Wallace) did not subject male IT PMs to similar treatment described above.  *Id.* ¶ 51.

---

[7] Plaintiffs identify the two white women as Kim Rae Valentine and Wendy DeLapp.  (ECF No. 1 ¶¶ 45, 49.)
[8] While Counts III and IV of Plaintiffs' Complaint references discrimination "based on sex," elsewhere in their allegations they refer to discrimination on the basis of "gender."  (ECF No. 1 at pp. 15–18, ¶¶ 1, 51.)  In accordance with Plaintiffs' asserted claims, the court refers to Plaintiffs' protected status at issue in these claims as their "sex."

**B. Procedural Background**

As set forth above, prior to initiating this action, Plaintiffs initiated contact with the EEO Office after their meeting with Ms. Amparan on January 27, 2021. (ECF No. 1 ¶ 40.) Ms. Burroughs asserts she initiated contact on February 1, 2021, and Ms. Miller on February 4, 2021.[9] *Id.; see* Requests to Initiate EEO Pre-Complaint Process (the "Pre-Complaint Forms"), Ex. 4, ECF No. 33-2 at pp. 242–52; Ex. 6, ECF No. 33-2 at pp. 258–69.[10] Subsequently, Ms. Burroughs and Ms. Miller filed formal EEO complaints with the Agency on March 22, 2021, and April 6, 2021, respectively. *Id.* ¶¶ 42–43. Both formal complaints named Division Chief Wagner, Deputy Division Chief Wallace, and Former Acting Chief Ariana Amparan as discriminating officials. *Id.* On November 15, 2021, Ms. Miller received a letter from the Agency providing an assigned case number (HS-CIS-00709-2021) for her formal Complaint and noting additional amendments as requested by Ms. Miller on October 30, 2021. (Ex. 5, ECF No. 33-12 at pp. 254–56.) Ms. Burroughs received a similar letter from the Agency, providing an assigned case number (HS-CIS-00683-2021), following an amendment request on October 20, 2021. (Ex. 7, ECF No. 33-12 at pp. 271–73.)

On July 31, 2023, the DHS Office for Civil Rights and Civil Liberties issued a Final Agency Decision as to Ms. Miller's EEO complaint, concluding, on the evidentiary record before it, Ms. Miller "failed to prove that the Agency discriminated against" her. (Ex. 8, ECF No. 33-2 at pp. 275–89.) A Final Agency Decision as to Ms. Burroughs's EEO Complaint was issued on August 1, 2023, similarly concluding on the evidentiary record that Ms. Burroughs "failed to prove [the Agency] discriminated against" her. *Id.* at pp. 229–313. The Final Agency

---

[9] As explained *infra*, the court cites to certain exhibits attached to Defendant's Motion because the court finds them integral to or relied upon in Plaintiffs' Complaint, and their authenticity is not in question.

[10] Plaintiffs' Complaint asserts that Ms. Burroughs and Ms. Miller initiated contact with the EEO Office on February 1, 2021, and February 4, 2021, respectively; however, the Pre-Complaint Forms, submitted by Plaintiffs and attached to Defendant's Motion, were signed by Ms. Burroughs on February 4, 2021, and Ms. Miller on February 10, 2021. (Ex. 6, ECF No. 33-1 at p. 268; Ex. 4, ECF No. 33-1 at p. 251.) In contrast, the Final Agency Decisions issued by DHS state that Ms. Burroughs made initial contact with an EEO counselor on February 1, 2021, and Ms. Miller on February 5, 2021. (Final Agency Decisions, Ex. 8, ECF No. 33-12 at pp. 275, 299.)

Actions attached a Notice of Appeal Rights, informing Plaintiffs of their right to appeal the Agency's decision to the Equal Employment Opportunity Commission ("EEOC") with 30 days of receipt of the decision or to file a civil action in an appropriate United States District Court within 90 days after receiving the decision if Plaintiffs chose not to appeal to the EEOC. *Id.* at pp. 290–91, 314–15.

Consequently, Plaintiffs initiated this action on November 1, 2023, in the United States District Court for the District of Columbia (Case No. 1:23-cv-03271-DLF) against Defendant Alejandro Mayorkas, (then) Secretary of DHS, in his official capacity. (ECF No. 1.) The Complaint asserts the following six counts:

> Count I: Discrimination Based on Race in Violation of Title VII[11] (Disparate Treatment);
>
> Count II: Discrimination Based on Race in Violation of Title VII (Hostile Work Environment);
>
> Count III: Discrimination Based on Sex in Violation of Title VII (Disparate Treatment);
>
> Count IV: Discrimination Based on Race in Violation of Title VII (Hostile Work Environment);
>
> Count V: Discrimination Based on Protected EEO Activity in Violation of Title VII (Retaliation – Disparate Treatment); and
>
> Count VI: Discrimination Based on Protected EEO Activity in Violation of Title VII (Retaliation – Hostile Work Environment).

(ECF No. 1 ¶¶ 52–108.)

On April 29, 2024, Defendant filed a Motion to Dismiss, or, Alternatively, for Summary Judgment (ECF Nos. 9, 10; the "First Motion to Dismiss"),[12] which the parties fully briefed. (ECF Nos. 16, 21.) Therein, Defendant argued: (1) venue in the District of Columbia was improper; (2) several of Plaintiffs' discrimination claims should be dismissed as untimely; (3)

---

[11] Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. §§ 2000e, *et seq.*).

[12] The D.C. District construed Defendant's motion at ECF No. 9 as a Motion to Dismiss and the motion at ECF No. 10 as a Motion for Summary Judgment. (ECF No. 22.) The court notes the only substantive difference in the motions is the addition of Defendant's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment attached to the motion at ECF No. 10. (*See* ECF No. 10-1 at pp. 1–8.)

Plaintiffs failed to state plausible claims for discrimination and retaliation; and (4) Plaintiffs' claims for hostile work environment failed to allege discriminatory action or alleged actions insufficiently severe or pervasive.  (ECF Nos. 9, 10 at pp. 22–48.)

On February 20, 2025, the D.C. District issued a memorandum opinion and order.  (ECF Nos. 22, 23.)  The court (Hon. Dabney L. Friedrich, presiding) granted in part Defendant's First Motion to Dismiss at ECF No. 9, dismissing as untimely Plaintiffs' disparate treatment claims for actions that occurred before December 18, 2020.  (ECF No. 23.)  Judge Friedrich found discriminatory actions alleged by Plaintiffs Burroughs and Miller to have occurred prior to December 18, 2020 and December 21, 2020, respectively, were not actionable bases for disparate treatment claims because Plaintiffs failed to initiate contact with an EEO counselor within 45 days of the allegedly discriminatory acts pursuant to 29 C.F.R. § 1614.105(a) and those claims were not subject to equitable tolling.[13, 14]  (ECF No. 22 at pp. 5–7.)  The alleged discriminatory acts included: "(1) the denial of incentive program bonuses; (2) both [P]laintiffs' non-selection as Acting Branch Chief; (3) Miller's 2018 performance rating; and (4) [Plaintiffs] lack of compensatory time."  *Id.* at p. 5.  Although Judge Friedrich held acts two through four were not actionable bases for disparate treatment claims, she noted they "may be considered when evaluating [] [P]laintiffs' hostile work environment claim" because such claims "are timely as long as one action falls within the filing period."  *Id.* at p. 7.  The court also held Defendant had not waived its timeliness defense, as the Agency raised the timeliness issue before the EEO.  *Id.* at p. 7.

---

[13] Pursuant to 29 C.F.R. § 1614.105(a)(1), pertaining to federal employees, "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."

[14] In construing the facts most favorably to Plaintiffs, Judge Friedrich calculated 45 days from the dates Plaintiffs alleged to have made their initial EEO contact as set forth in the Complaint—February 1, 2021, as to Ms. Burroughs and February 4, 2021, as to Ms. Miller. (ECF No. 1 ¶ 40.)  Although Judge Friedrich's final order dismisses as untimely Plaintiffs' disparate treatment claims for actions that occurred prior to December 18, 2020 (ECF No. 23), this court will adhere to the separate dates indicated as to each Plaintiff above, in accordance with the court's memorandum opinion at ECF No. 22 at p. 5.

The D.C. court transferred the remaining claims to this court after finding that the District of Maryland was the appropriate venue for the majority of Plaintiffs' claims pursuant to Title VII's special venue provisions because "most of the alleged discriminatory actions occurred after December 31, 2020, when the Agency's headquarters" moved to Maryland from the District of Columbia. (ECF No. 22 at pp. 7–9; ECF No. 23.) The D.C. court also ordered Defendant to respond to Plaintiffs' Complaint within 21 days of the case being placed on the electronic docket in this court. (ECF No. 23.)

The action was transferred to this court on March 4, 2025. (ECF No. 24.) After the court granted two motions to extend time filed by Defendant, Defendant filed the instant Motion on June 2, 2025 (ECF No. 33), which has been fully briefed. (*See* ECF Nos. 53, 57.) Upon review of Defendant's instant Motion, the court required the parties to submit simultaneous briefs as to Plaintiffs' argument, raised in their opposition, pertaining to re-litigation of matters previously ruled on by the D.C. court, that this court should reconsider the transferring court's decision to dismiss as untimely Plaintiffs' disparate treatment claims for actions that occurred prior to December 18, 2020. (ECF No. 66.) The court administratively stayed this action pending the court's determination of that discrete issue.

The parties filed their respective briefs on that narrow issue on April 20, 2026. (ECF Nos. 69, 70.) Upon review of the parties' submissions, the court finds it can address Defendant's Motion in full, beginning with an analysis of the discrete issue described above.

## II.    LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(d)

Defendant brings the Motion as a motion to dismiss or, alternatively, for summary judgment. (ECF No. 33.) "A motion with this caption implicates the court's discretion under FED. R. CIV. P. 12(d)." *Hayes v. Maryland Transit Admin.*, 708 F. Supp. 3d 683, 688 (D. Md. 2023), *aff'd*, No. 24-1482, 2024 WL 4262786 (4th Cir. Sept. 23, 2024) (quoting *Snyder v. Md.*

*Dep't of Transp.*, No. CCB-21-930, 2022 WL 980395, at *4 (D. Md. Mar. 31, 2022)).  Federal Rule of Civil Procedure 12(d) provides: "[i]f, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  FED. R. CIV. P. 12(d).

"A district judge has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it'"; such discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Sammons v. McCarthy*, 606 F. Supp. 3d 165, 193 (D. Md. 2022) (quoting 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2018)); *see Sol v. M&T Bank*, 713 F. Supp. 3d 89, 99–100 (D. Md. 2024) (same).  "In general, courts are guided by whether consideration of extraneous material 'is likely to facilitate the disposition of the action,' and 'whether discovery prior to the utilization of the summary judgment procedure' is necessary."  *Sammons*, 606 F. Supp. 3d at 193 (quoting 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366).

"There are two requirements for a proper Rule 12(d) conversion."  *Greater Balt. Ctr. for Pregnancy Concerns. Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013).  "First, all parties must 'be given some indication by the court that it is treating the Rule 12(b)(6) motion as a motion for summary judgment,' which can be satisfied when a party is aware 'material outside the pleadings is before the court.'"  *Snyder v. Maryland Dep't of Transportation*, No. CV CCB-21-930, 2022 WL 980395, at *4 (D. Md. Mar. 31, 2022) (quoting *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985)).  Where a movant expressly captions a motion as one for summary judgment "in the alternative," the non-movant is "on notice that this motion might be treated as one for summary judgment"; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253,

10

260–61 (4th Cir. 1998).  Second, customarily, the parties must first "be afforded a reasonable opportunity for discovery." *Gay*, 761 F.2d at 177.

"Generally, if a party believes that summary judgment is procedurally inappropriate because the party needs discovery to properly oppose the motion, the party should file a Rule 56(d) affidavit informing the court of such." *Sol*, 713 F. Supp. 3d at 100 (citing *Sager v. Hous. Comm'n of Anne Arundel Cnty.*, 855 F. Supp. 2d 524, 542–43 (D. Md. 2012)).  Even still, where a party fails to file an affidavit, "a district court abuses its discretion by granting summary judgment when it otherwise has 'fair notice of . . . potential dispute[s] as to the sufficiency of the summary judgment record.'" *Shaw v. Foreman*, 59 F.4th 121, 128 (4th Cir. 2023) (quoting *Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021)).  The nonmovant may not, however, "demand discovery for discovery's sake; a Rule 56(d) request is properly denied 'where the additional evidence sought . . . would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment.'" *Gardner v. United States*, 184 F. Supp. 3d 175, 181–82 (D. Md. 2016) (quoting *Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995)).

Here, based on its title (as discussed in footnote 2, *supra*), the court construes Defendant's Motion to seek dismissal pursuant to Rule 12(b)(6) or, in the alternative, summary judgment pursuant to Rule 56.  In support of his request for summary judgment, Defendant asks this court to consider 19 exhibits attached to the Motion, consisting of affidavits from Plaintiffs' individual supervisors and Plaintiffs themselves, internal Agency documents pertaining to Plaintiffs' internal EEO Office complaint process, the Final Agency Decisions, declarations of other Agency staff, and correspondence pertaining to Plaintiffs allegations. (*See* Exs. 1–19, ECF Nos. 33-2–33-4.)[15]  Plaintiffs argue that converting the instant Motion

---

[15] As noted by Plaintiffs, Defendant has not included a statement of undisputed material facts in the instant Motion. Thus, Plaintiffs refer to Defendant's Statement of Undisputed Material Facts in Support of the Motion for Summary Judgment ECF No. 10-1 pursuant to Local Rule 7(h) of the District Court for the District of Columbia (the "Rule 7(h) Statement").  With respect to motions for summary judgment, the Local Rules for the U.S. District Court for the District of Columbia provide in pertinent part:

into one for "summary judgment is entirely inappropriate at this stage of the litigation as there has been no opportunity for discovery[.]" (ECF No. 53 at p. 1 n.1.)

Although Plaintiffs have not filed a Rule 56(d) affidavit in response to the instant Motion, the court notes that Plaintiffs rely on their previously filed response to Defendant's Rule 7(h) Statement filed in support of the prior motion for summary judgment at ECF No. 10. (*See* ECF No. 16-1.)  Thus, Plaintiffs assert there are "significant material facts in dispute that merit at a minimum discovery but also a trial as there are credibility issues at stake." (ECF No. 53 at pp. 1–2 n.1.)  While this case has been pending since 2023, it remains in its procedural infancy, as discovery has not yet commenced.  The court agrees that such discovery would tend to bear on material facts that may well, at a minimum, generate a triable issue hinging on witness credibility and "is likely to facilitate the disposition of the action." *Sammons*, 606 F. Supp. 3d at 193, *supra*.  The court therefore declines to convert Defendant's Motion and will resolve it per the standard applicable to a Rule 12(b)(6) challenge.

## B.  Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint." *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *as amended* (Jan. 20, 2017) (quoting *Papasan v. Allain*, 478 U.S. 265, 283 (1986)).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as

---

Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement.  An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. . . . In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

Local Rule 7(h) (D.D.C. 2025).  Accordingly, Defendant filed the Rule 7(h) Statement described above and Plaintiffs filed a response in opposition, attached to their response to Defendant's prior motion, asserting material facts are in dispute.  (ECF No. 16-1.)

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that 'the defendant is liable for the misconduct alleged.'" *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level, thereby nudging its claims across the line from conceivable to plausible." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (citation modified) (quoting *Twombly,* 550 U.S. at 555, 570). The plausibility requirement is not "a probability requirement but rather a mandate that a plaintiff 'demonstrate more than a sheer possibility that a defendant has acted unlawfully." *In re Birmingham*, 846 F.3d at 92 (quoting *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)). Reliance on "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 555.

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court usually does not consider evidence outside of the complaint. The court may, however, consider "documents integral to and relied upon in the complaint, . . . so long as the plaintiff does not question their authenticity." *Fairfax v. CBS Corp.*, 2 F.4th 286, 292 (4th Cir. 2021). "To be 'integral,' a document must be one 'that by its very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Wooten v. Univ. of Maryland, Baltimore*, 733 F. Supp. 3d 402, 415 (D. Md. 2024) (emphasis in original) (quoting *Chesapeake Bay Found. Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d. 602, 611 (D. Md. 2011)). "In addition to integral and authentic exhibits, on a 12(b)(6) motion the court 'may properly take judicial

13

notice of matters of public record.'" *Chesapeake Bay Found., Inc.*, 794 F. Supp. 2d. at 611 (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). Specifically, the court may take judicial notice of publicly available information on state and federal government websites without converting the motion to one for summary judgment. *See U.S. v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on the state and federal government websites.").

Plaintiffs' Pre-Complaint Forms, the Final Agency Decisions, and the attached Notice of Appeal letters attached as Exhibits 4, 6, and 8 to Defendant's Motion are expressly referenced in the Complaint, they are integral to Plaintiffs allegations (inasmuch as their entitlement to pursue this action arises in part from exhaustion of administrative remedies), and there is no challenge as to their authenticity. (ECF No. 33-12 at pp. 241–52, 257–69, 274–321.) Accordingly, the court may consider them in evaluating the Motion; but the balance of exhibits to Defendant's Motion and exhibits attached to Plaintiffs' opposition shall not be considered.

## III.    ANALYSIS

As an initial matter, Plaintiffs ask this court to reconsider under Fourth Circuit law the claims dismissed by the D.C. court and "reject Defendant's fevered contentions that Plaintiffs' claims are untimely because they were not administratively exhausted." (ECF No. 53-1 at pp. 22–23.) In reply, Defendant argues the court should deny Plaintiffs' request pursuant to the law of the case doctrine and *res judicata*. (ECF No. 57 at pp. 2–4.) As explained above, the parties subsequently submitted additional briefing on this issue. (*See* ECF Nos. 69, 70.) Accordingly, the court first addresses whether this court should review the transferring court's decision dismissing as untimely Plaintiffs' disparate treatment claims for actions that occurred before December 18, 2020, or whether it should refrain from doing so pursuant to the law of the case doctrine.

### A. Law of the Case Doctrine

Pursuant to Federal Rule of Civil Procedure 54(b),[16] "a district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 256 (4th Cir. 2018) (quoting *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003)). Thus, the Fourth Circuit has "cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case." *Id.* at 257 (quoting *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017)).

The law of the case doctrine "generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (quoting *Pepper v. United States,* 562 U.S. 476, 506 (2011)) (internal quotations omitted). While the doctrine does not limit courts' power, it "expresses the practice of courts generally to refuse to reopen what has been decided[.]" *Id.* at 245 (quoting *Messenger v. Anderson,* 225 U.S. 436, 444 (1912)). "[T]he doctrine applies both to questions actually decided as well as to those decided by necessary implication[.]" *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008) (quoting *Sejman v. Warner–Lambert Co.,* 845 F.2d 66, 69 (4th Cir.1988)). Accordingly, the Fourth Circuit has held "a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case: '(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice.'" *U.S. Tobacco*, 899 F.3d at 257 (quoting *Carlson*, 856 F.3d at 325).

The effect of the doctrine is twofold: first, it "advances the interests of efficiency and judicial economy[;]" and second, it "bolsters public confidence in the judiciary by providing

---

[16] Rule 54(b) provides in pertinent part: "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." FED. R. CIV. P. 54(b).

parties with consistency and finality." *Chase v. Dep't of Pub. Safety & Corr. Servs.*, No. CV ELH-18-2182, 2020 WL 1914811, at *11 (D. Md. Apr. 20, 2020) (citations omitted).  As previously explained by Judge Hollander of this court:

> The doctrine has two components: a vertical branch, known as the "mandate rule," and a horizontal branch.  *See United States v. Matthews*, 643 F.3d 9, 13 (1st Cir. 2011).  The mandate rule, which flows from the hierarchal nature of our judicial system, provides that "'once a case has been decided on appeal and a mandate issued, the lower court may not deviate from that mandate but is required to give full effect to its execution.'" *Mangum v. Hallembaek*, 910 F.3d 770, 776 (4th Cir. 2018) (quoting *Invention Submission Corp. v. Dudas*, 413 F.3d 411, 414 (4th Cir. 2005)) . . .
>
> In contrast, the horizontal aspect of the doctrine "expresses the practice of courts generally to refuse to reopen what has been decided" by the court in the same case.  *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912) (Holmes, J.).  For instance, courts regularly decline to revisit transfer decisions rendered by the transferor court.  *See Christianson*, 486 U.S. at 816, 108 S.Ct. 2166 (recognizing that a contrary rule would "threaten to send litigants into a vicious circle of litigation").  And, as the Fourth Circuit has explained, the law of the case doctrine applies to interlocutory rulings, notwithstanding the fact that such decisions are amenable to revision, pursuant to FED. R. CIV. P. 54.  *See Carlson*, 856 F.3d at 325 (holding that "a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case").

*Id.*  Thus, as noted by Judge Hollander, "the law of the case doctrine is not an unyielding diktat, but a flexible tool of judicial administration."  *Id.* at *13.

As noted above, Defendant argues Plaintiffs' request for reconsideration of their previously dismissed claims is barred by the law of the case doctrine and *res judicata*.  (ECF No. 69 at pp. 2–4.)  Plaintiffs contend this court, as the transferee court, "has the authority to revise any interlocutory order prior to final judgment" pursuant to Rule 54(b) and the law of the case doctrine dictates "that the transferee court reconsider the transferor court's decision due to the change in applicable law and clear error."  (ECF No. 70 at pp. 1–4.)

Here, the court finds that the law of the case doctrine applies, as the record reveals no change in applicable law or clear error on the part of the transferor court which would warrant reconsideration of the transferor court's order dismissing as untimely Plaintiffs' disparate treatment claims for actions that occurred before December 18, 2020. The court need not address the first circumstance under which departure from the doctrine may be warranted—a subsequent trial producing substantially different evidence—as no trial has occurred in this action, and Plaintiffs do not contend that any new or different evidence has emerged since the transferor court issued its decision.

With respect to a change in applicable law, as noted by Defendant, this court has previously found that a district court's "pretrial rulings constitute the law of the case and will continue to do so upon any future transfer[,]" noting "[t]he possibility that different appellate courts might review [a] [c]ourt's rulings differently is not, itself, a reason not to transfer cases." *Bell v. CSX Transportation, Inc.*, No. CV JKB-18-00744, 2024 WL 4570851, at *1 (D. Md. Oct. 24, 2024). In *Bell v. CSX Transportation, Inc.*, a putative class action case, the defendant, CSX, expressed concern about the possibility of conflicting appellate rulings after the court raised the issue of transferring the cases of the non-Maryland plaintiffs to their respective home districts. *Id.* Therein, Judge Bredar of this court explained:

> CSX is correct that generally, upon transfer, a transferee court in a federal-question case applies the law of its circuit. *See Murphy v. FDIC*, 208 F.3d 959, 965–66 (11th Cir. 2000); 15 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3846 (hereinafter "Wright & Miller"). CSX raises concerns about the possibility that this Court's pretrial rulings could be subject to contradictory appellate rulings, but this concern is speculative, and the fear that different federal appeals courts could come to different conclusions in applying the same body of federal law may not even be cognizable. *Cf. United Status ex ret. Staley v. Columbia/Healthcare Corp.*, 587 F. Supp. 2d 757, 762 (W.D. Va. 2008) (rejecting the proposition that "a circuit split qualifies as a change in controlling law" sufficient to reconsider law of the case) (citing *EEOC v. Nw. Airlines, Inc.*, 188 F.3d 695, 700 (6th Cir. 1999) ("Federal law is presumed to be uniform, whether or not it is in fact.")). In any event, the same

> potential concern is present in multidistrict litigation, yet does not appear to undermine the utility of multidistrict litigation as a method for efficiently resolving large numbers of related cases. *See* 15 Wright & Miller § 3867 (explaining that a federal appeals court reviewing the judgment of a transferee court in a multidistrict litigation applies the law of its own circuit).

*Id.* at *1 n.2.

Plaintiffs here cite *Belmora LLC v. Bayer Consumer Care AG* for the proposition that "when one district court transfers a case to another, the norm is that the transferee court applies its own Circuit's cases on the meaning of federal law." 987 F.3d 284, 293 (4th Cir. 2021) (citation omitted). Importantly, that case did not address the law of the case doctrine and whether a transferee court should reconsider pretrial rulings made by the transferring court. In *Belmora*, after the plaintiff's claims were transferred from the Central District of California to the Eastern District of Virginia, the Virginia court found the plaintiff's Lanham Act claims were barred by the most analogous state statute of limitations. *Id.* at 292–94. Accordingly, the issue on appeal was whether to apply a statute of limitations borrowed from the most analogous state law or some other timeliness rule drawn from federal law to a Lanham Act claim. *Id.* at 293. While the court noted that "federal law is a 'single body of law,' which each federal court has an obligation to . . . independently' interpret[,]" there were no pretrial rulings made by the transferor court to address. *Id.* at 292–93 (citations omitted).

Here, Plaintiffs' claims are all brought pursuant to Title VII, a federal statute, which requires both the transferor court (the D.C. court) and this court to apply federal law—a "single body of law." *Belmora* LLC, 987 F.3d at 292–93. As Defendant notes, the transferor court's decision was based on federal statutes and regulations which are applicable in this jurisdiction. (ECF No. 69 at p. 2 n.2.) This court discerns no applicable change in law requiring it to depart from the law of the case. Moreover, the court disagrees with Plaintiffs' assertion that it is "of critical importance for a transferee court to reconsider a pre-transfer decision to ensure the underlying issue is reviewable on appeal by the transferee's circuit" when the prior decision is

18

made by a transferor court sitting in a different circuit.  (ECF No. 70 at p. 3.)  As noted by Judge Bredar in *Bell*, the possibility of conflicting appellate rulings when applying the same body of federal law is merely speculative and does not qualify as a change in controlling law. *Bell*, 2024 WL 4570851, at *1, *supra*.

As to clear error causing manifest injustice, "a prior decision does not qualify for the third exception [on which a court may depart from the law of the case] by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *U.S. Tobacco*, 899 F.3d at 258 (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009)) (cleaned up).  In other words, "[it] must be dead wrong." *Id.*  Moreover, whereas here, "'the order was entered by one judge and then reviewed by another,' courts have held that the latter judge should be hesitant to overrule the earlier determination." *Carlson*, 856 F.3d at 325 (quoting *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1460 n.24 (5th Cir. 1992)); *see Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (holding that "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances").

Neither in opposition to the instant Motion nor in their supplemental brief on this discrete issue do Plaintiffs assert or demonstrate clear error in the transferor court's ruling resulting in manifest injustice or extraordinary circumstances to warrant reconsideration. Plaintiffs also fail to cite authority identifying clear error under similar circumstances, or any authority addressing clear error at all.  In fact, Plaintiffs put forth the same arguments in this court as they did before Judge Friedrich in the District of Columbia—that their untimely claims were subject to equitable tolling or, in the alternative, Defendant waived a timeliness defense. (*See* ECF No. 22 at pp. 5–7; ECF No. 53-1 at pp. 22–32.)  Whereas the court discerns no

extraordinary circumstances in this case and Plaintiffs do not argue the transferor court's decision was clear error, the court sees no grounds upon which to revisit the prior ruling.

Accordingly, the court applies the law of the case doctrine and declines to revisit or reconsider the order of the D.C. District. As held by Judge Friedrich, the court may consider acts two through four (Plaintiffs' non-selection as Acting Branch Chief, Ms. Miller's 2018 performance rating, and Plaintiffs' lack of compensatory time) when evaluating their hostile work environment claims. (ECF No. 22 at p. 7.) The court next turns to Defendant's arguments as to Plaintiffs' remaining claims.[17]

## B. Plaintiffs' Title VII Claims

Plaintiffs allege they were subject to discrimination and a hostile work environment on the basis of their sex and race, and that Defendant took materially adverse actions against them—namely, the denial of promotional opportunities, stripping them of certain job duties, and denial of the CRI bonus—in retaliation for Plaintiffs' legally protected activities in violation of Title VII. (ECF No. 1 ¶¶ 52–108.)

By way of background, "Title VII forbids (i) employment practices that discriminate against an employee on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2, and (ii) retaliation against an employee for opposing adverse actions that she reasonably suspects to be unlawful under Title VII, 42 U.S.C. § 2000e-3." *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018). "A plaintiff pursuing a claim under Title VII may either offer direct evidence of discrimination or, using indirect evidence, she may rely on the burden shifting framework that was adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)." *Coleman v. Whitley*, No. 21-1181, 2022 WL 16630570, at *2 (4th Cir. Nov. 2, 2022). "The plaintiff need not commit to either of the two

---

[17] The court need not address Defendant's argument that reconsideration is barred by *res judicata*. (ECF No. 69 at pp. 3–6.)

approaches at the motion to dismiss stage." *Williams-Johnson v. Paris Foods Corp.*, No. CV RDB-24-1197, 2025 WL 2257617, at *3 (D. Md. Aug. 7, 2025) (citing *Chen v. Md. Dep't of Health & Mental Hygiene*, No. ELH-15-1796, 2016 WL 4539204, at *17 (D. Md. Aug. 29, 2016)).

"To survive a motion to dismiss, however, an employment discrimination claim need not establish a *prima facie* case." *Copes v. Johns Hopkins Univ. Applied Physics Lab'y, LLC*, No. CV RDB-23-2306, 2025 WL 19987, at *4 (D. Md. Jan 2, 2025) (citing *McCleary-Evans v. Md. DOT*, 780 F.3d 582, 584 (4th Cir. 2015)).  Instead, the court's inquiry is whether a plaintiff "alleges facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).  Said differently, "the facts alleged must 'support a *reasonable inference* that the decisionmakers were motivated by bias.'" *Copes*, 2025 WL 19987, at *4 (quoting *McCleary-Evans*, 780 F.3d at 586) (emphasis in original).  "Reference to the elements of a *prima facie* claim of discrimination 'is helpful to gauge the sufficiency of the allegations' even if the pleading is not actually required to satisfy all the elements." *Williams-Johnson*, 2025 WL 2257617, at *3 (citing *Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 734 (D. Md. 2023)).

As an initial matter, the timely allegations brought by Plaintiffs are as follows:[18]

1. Management's denial of Plaintiffs' requests for additional staffing (December 2018 through 2021);

---

[18] In the instant Motion, Defendant includes only incidents alleged by Plaintiffs that occurred on or after December 21, 2020 (for Ms. Burroughs), and December 27, 2020 (for Ms. Miller), which the Agency claims is 45 days prior to Plaintiffs' initial EEO contact on February 4, 2021, and February 10, 2021 (and in accordance with 29 C.F.R. § 1614.105(a)), the dates Plaintiffs submitted their respective Pre-Complaint Forms.  (ECF No. 33-1 at pp. 8–10.) As noted by the court in footnote 9, *supra*, the initial contact dates provided by Plaintiffs in the Complaint conflict with dates provided in Plaintiffs' Pre-Complaint Forms and the Final Agency Decisions.  Accepting Plaintiffs' allegations in the Complaint as true, and in accord with the transferor court's decision as described in footnote 13, *supra*, the court will rely on the dates provided by Plaintiffs in the Complaint (February 1, 2021, as to Ms. Burroughs and February 4, 2021, as to Ms. Miller).  (ECF No. 1 ¶ 40.)  Accordingly, only alleged incidents occurring prior to December 18, 2020, and December 21, 2020, as to Ms. Burroughs and Ms. Miller respectively, are not actionable bases for their disparate treatment claims.

2. Management's harassment of Ms. Miller for being unable to meet impossible standards or standards requiring additional employees (December 2018 through June 22, 2021);

3. Appointment of co-worker and former Acting Branch Chief Ariana Amparan to do an assessment of and scrutinize Plaintiffs without their knowledge (June 2020 through February 28, 2021);

4. A meeting where Ms. Amparan backtracked on a previous statement that she joined Plaintiffs' team to conduct surveillance and a secret assessment of Plaintiffs; and where Ms. Amparan acknowledged sending a monkey emoji to Plaintiffs in a December 18, 2020, Teams message with awareness of the discriminatory nature of such image due to Plaintiffs' race (January 27, 2021);

5. Undermining of Ms. Miller's authority with respect to contract decisions (January 28, 2021);

6. A telephone meeting with Plaintiffs, their peers, and management during which Deputy Division Chief Wallace chastised Plaintiffs, became agitated, abrupt, and unprofessional, following which Wallace responded to Ms. Burroughs's email complaint of a toxic work environment with "thanks" (February 10, 2021);

7. Non-selection of Plaintiffs for Acting Branch Chief of Mission Support in favor of Kim Rae Valentine (white female) who was non-competitively selected for the position (February 26, 2021), and the subsequent selection of Wendy DeLapp (white female) for Acting Branch Chiefs over Plaintiffs; and

8. Plaintiffs' removal from the Integrated Project Team and vendor communication, scheduling and decision-making duties for the product and contract; removal from lead role on the Stars contract (September 16, 2021).

9. Significant decrease in Plaintiffs' duties after filing their respective discrimination complaints (September through October 2021);

10. Having Ms. Burroughs' job made more difficult with unnecessary work through a forced recompete of a contract with two option periods left and withholding resources to fully fund the contract (October 2021);

11. Ms. Burroughs' lowered performance rating and change of reviewing officials (October 15, 2021);

12. Denial of the opportunity to earn comp time a coworker was afforded (October 15, 2021); and

13. Plaintiffs' receipt of different treatment as African American women by their white supervisors (Division Chief Wagner, Deputy Division Chief Wallace) in comparison to certain male IT PMs.

(ECF No. 1 ¶¶ 21–51.)

### 1. *Disparate Treatment Claims*

Counts I and III of the Complaint (for race and sex discrimination) assert claims for unlawful discrimination based on disparate treatment. (ECF No. 1 ¶¶ 52–61, 71–80.) Therein, Plaintiffs allege they were subject to adverse employment actions "including, but not limited to, subjecting them to discriminatory non-selections" as Acting Branch Chief of their unit, stripping them of their professional duties, and non-receipt of the 2018 CRI Bonus. *Id.* ¶¶ 58, 77. Although Count V is styled as a "Retaliation–Disparate Treatment" claim, the court finds that Count V is more appropriately analyzed under the separate framework governing retaliation claims because the claim is premised on alleged retaliation for Plaintiffs' protected EEO activity. Thus, the court will address Plaintiffs' retaliation claim separately.

"To establish a claim of disparate treatment under Title VII, a plaintiff must put forth a *prima facie* case of discrimination alleging that: '(1) she is a member of a protected class; (2) she 'suffered an adverse employment action'; (3) her job performance was satisfactory; and (4) the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'" *Iwebo v. Sheppard Pratt Health Sys., Inc.*, No. CV BPG-19-3008, 2020 WL 4748579, at *5 (D. Md. Aug. 14, 2020) (quoting *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017), as amended (Aug. 11, 2017)). "The fourth element is met if 'similarly-situated employees outside the protected class received more favorable treatment.'" *Id.* (quoting *Swaso*, 698 F. App'x at 747).

23

Regarding the sufficiency of comparators to satisfy the fourth element, as recently explained by the Fourth Circuit:

> [T]here must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other *prima facie* evidence, would allow a jury to reach an inference of discrimination." *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017) (internal quotation marks omitted) (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)). While there is no "bright-line" rule for what makes two comparators "similar" for purposes of Title VII claims, courts consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Spencer v. Virginia State University*, 919 F.3d 199, 207 (4th Cir. 2019) (citation omitted); *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (concluding that factors rendering comparators similar include whether they "dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct."); *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381 (4th Cir. 2022).

*Johnson v. Baltimore City, Maryland*, 163 F.4th 808, 815–16 (4th Cir. 2026). "For failure to promote claims, allegations that a plaintiff was rejected for a position in favor of a less qualified candidate from outside her protected class can support an inference that the employer acted because of the plaintiff's protected status." *Brooks v. UPS Inc.*, No. CV DKC 20-2617, 2021 WL 4339194, at *12 (D. Md. Sept. 23, 2021).

Defendant first moves to dismiss Plaintiffs' disparate treatments claims (Counts I and III) for failure to state a claim. Defendant argues the only remaining timely adverse employment actions alleged by Plaintiffs as to Counts I and III include: (1) being stripped of their duties; and (2) being denied selection as Acting Branch Chief in favor of Ms. Valentine.

(ECF No. 33-1 at p. 15.)  Having concluded above that the D.C. court order dismissing claims relating to denial of a CRI bonus in 2018 stands, the court agrees.

The parties do not appear to dispute, and the court is satisfied, that Plaintiffs meet the first three elements of a *prima facie* case.  Defendant's argument hinges on the fourth element, whether the adverse employment actions "occurred under circumstances giving rise to an inference of unlawful discrimination."  *Iwebo*, 2020 WL 4748579, at *5, *supra.*  Accordingly, Defendant argues Plaintiffs have failed to plausibly allege an inference of race or sex discrimination arising from either being stripped of their duties or the denial of promotion to Acting Branch Chief.  (ECF No. 33-1 at pp. 15–18.)

Here, Plaintiffs' Complaint fails to identify sufficient comparators to satisfy the fourth element of a *prima facie* case.  The timely allegations set forth above identify Kim Valentine and Wendy DeLapp as white women who Plaintiffs claim were "non-competitively selected" as Acting Branch Chiefs over Plaintiffs—the only two African American women in their branch—on two separate occasions.  (ECF No. 1 ¶¶ 45, 49.)  Here, the white female comparators promoted above Plaintiffs fail to state a claim of discrimination on the basis of sex or race.  First, their promotions cannot serve as the basis for a sex discrimination claim because, like Plaintiffs, Valentine and DeLapp are women.  As for a claim of race discrimination, although both women are identified as white, Plaintiffs do not allege that Valentine or DeLapp was unqualified or less qualified than either Plaintiff; thus although Valentine and DeLapp are white, the allegations of their respective selections over Plaintiffs fail to support an inference that Defendant failed to promote or consider Plaintiffs for promotion due to their race.  *See Brooks*, 2021 WL 4339194, at *12, *supra.*  Other than a conclusory statement alleging Ms. Valentine was "non-competitively selected" for the Acting Branch Chief role, Plaintiffs assert no facts as to either Ms. Valentine's or Ms. DeLapp's qualifications, or lack thereof, for the position.

With respect to their sex discrimination claim, Plaintiffs identify "male IT PM . . . Paul (Trey) McCranie, and his successor, IT PM Justin Staples" who they claim were "treated much better by white management and were not subjected to the numerous discriminatory and harassing acts" to which Plaintiffs were subjected.  (ECF No. 1 ¶ 51.)  Although Plaintiffs allege Mr. McCranie and Mr. Staples held the same title as Plaintiffs (IT PM), Plaintiffs allege no facts regarding whether they had the same job description/s as Plaintiffs,[19] were subject to the same standards, were subordinate to the same supervisor, or had comparable experience, education, and other qualifications.  Without such information, the court is unable to assess whether there are "sufficient commonalities on the key variables" between/among Plaintiffs and Mr. McCranie and Mr. Staples "to allow the type of comparison that, taken together with the other *prima facie* evidence, would allow a jury to reach an inference of discrimination." *Johnson*, 163 F.4th 815–16.  Thus, Plaintiffs fail to set forth sufficient comparators with respect to their sex discrimination claim.

Absent sufficient comparators, Plaintiffs cite a recent Fourth Circuit case for the proposition that "[d]iscriminatory comments by key decisionmakers can serve as circumstantial evidence of pretext under the *McDonnell Douglas* framework, even if the comments are not direct evidence of discrimination with respect to the specific employment decision at issue." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 259 (4th Cir. 2025). Thus, Plaintiffs claim "[t]he statements and acts directed at Miller and Burroughs taken as a whole . . . permit a jury to infer discrimination and pretext."  (ECF No. 53-1 at p. 36.) Importantly, however, the next sentence of the Fourth Circuit's opinion states: "language not amounting to direct evidence, but showing some racial animus, may be *significant* evidence of pretext once a plaintiff has set out the *prima facie* case."  *Wannamaker*, 126 F.4th at 259

---

[19] Of course while two individuals may have the same organizational job title, individual work duties or job descriptions may be different.

26

(quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1362 (11th Cir. 1999)) (emphasis in original).  In *Wannamaker*, the Fourth Circuit was reviewing the lower court's grant of a motion for summary judgment, not a motion to dismiss, as is the case here.  *Id.* at 250.  Importantly, there, the court found the plaintiff had satisfied the fourth element to establish a *prima facie* case of discrimination by identifying a sufficient comparator.  *Id.* at 255.

Here, Plaintiffs' Complaint fails to set forth sufficient, essential factual allegations as to comparators; thus they have not set out a *prima facie* case.  "Although a full analysis of whether comparators are similarly situated does not necessarily occur at the motion-to-dismiss stage, a plaintiff must still plead sufficient facts to justify an inference that the employer treated the plaintiff differently from the way it treated others under 'arguably similar circumstances.'" *Tittle v. Petro*, Civ. No. TDC-24-3061, 2025 WL 1920936, at *6 (D. Md. July 11, 2025) (quoting *Woods v. City of Greensboro*, 855 F.3d 639, 651 (4th Cir. 2017)).

Moreover, Plaintiffs fail to allege facts to "support a *reasonable inference* that the decisionmakers were motivated by bias." *Copes v. Johns Hopkins Univ. Applied Physics Lab'y, LLC*, No. CV RDB-23-2306, 2025 WL 19987, at *4 (D. Md. Jan 2, 2025) (citing *McCleary-Evans v. Md. DOT*, 780 F.3d 582, 584 (4th Cir. 2015)).  While Plaintiffs do not need to identify sufficient comparators to establish a *prima facie* case of discrimination, Plaintiffs must still "present evidence that reasonably creates an inference of an unlawfully discriminatory motive to shift the burden to" Defendant.  *Noonan v. Consolidated Shoe Co., Inc.*, 84 F.4th 566, 573 (4th Cir. 2023).  Here, without sufficient comparators, none of the timely allegations brought by Plaintiffs, as outlined above, allow for the reasonable inference that stripping Plaintiffs of their duties or failure to promote them was based on race or sex or improperly motivated by either.  Thus, viewing the Complaint in a light most favorable to Plaintiffs, Plaintiffs do not plausibly allege that "stripping" or reducing their duties and denying

27

them promotion to Acting Branch Chief occurred under circumstances that raise a reasonable inference of unlawful discrimination on the basis of Plaintiffs' race or sex.

Accordingly, Counts I and III will be dismissed.

### 2. *Hostile Work Environment Claims*

Counts II and IV of the Complaint (for race and sex discrimination) assert claims for hostile work environment.   (ECF No. 1 ¶¶ 62–70, 81–89.)[20]   Plaintiffs allege they were subjected to a severe or pervasive hostile work environment in light of the following alleged discriminatory conduct perpetrated by Defendant's agents and employees:

> [S]ubjecting Ms. Miller and Ms. Burroughs to impossible work standards, denying assistance in the form of additional staff for their unit, subjecting Plaintiffs to heightened scrutiny concerning their work performance, denying and impeding Plaintiffs from receiving a bonus that their white coworkers were provided, denying opportunities for Plaintiffs to work as the acting supervisor of their unit, subjecting Plaintiffs to disparaging comments in a meeting, subjecting Plaintiffs to a decrease of their duties and a reduction of the scope of their role as program managers, and subjecting Plaintiffs to a racist, discriminatory image.

*Id.* ¶¶ 63, 82.

"To state a hostile work environment claim, a plaintiff must allege offending behavior that was (1) unwelcome, (2) based on race [or another protected class], (3) sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive atmosphere, and (4) imputable to the employer." *Booth v. Cnty. Executive*, 186 F. Supp. 3d 479, 486 (D. Md. 2016) (citations omitted).  "The standard for proving an abusive work environment is intended to be a very high one because the standard is designed to filter out complaints attacking the ordinary tribulations of the workplace." *Fordyce v. Prince George's Cnty. Maryland*, 43 F. Supp. 3d 537, 552 (D. Md. 2014) (quoting *Wang v. Metro. Life Ins. Co.,* 334 F.Supp.2d 853,

---

[20] Count VI of the Complaint sets forth another retaliation claim, styled as a "Retaliation–Hostile Work Environment" claim.  (ECF No. 1 at p. 19.)  As with Count V discussed above, the court finds that Count VI is more appropriately analyzed under the separate framework governing retaliation claims and the court will address the retaliation claims separately.

864 (D. Md. 2004)).  "Generally, the [c]ourt may consider facts and events occurring outside the limitations period as relevant to timely claims, even if those events could not be the subject of a timely claim."  *Leckie v. Bd. of Educ. of Montgomery Cnty.*, No. CV TDC-23-0299, 2023 WL 8809310, at *3 (D. Md. Dec. 19, 2023).

Regarding the severe or pervasive element, as previously explained by this court:

> In weighing whether conduct was sufficiently "severe or pervasive" under the third element of a hostile workplace environment claim, courts consider the following non-exhaustive factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. The Fourth Circuit has set a "high bar in order to satisfy the severe or pervasive test[.]"

*Green v. iMentor, Inc.*, No. CV RDB-24-2567, 2025 WL 2299432, at *8 (D. Md. Aug. 8, 2025) (internal citations omitted).  The severe or pervasive "element of a hostile work environment claim has both subjective and objective components.  Therefore, the [defendant] must show that [the plaintiff] did perceive, and a reasonable person would perceive, the environment to be abusive or hostile."  *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–23 (1993)).

Here, Defendant argues all the alleged discrete discriminatory incidents set forth by Plaintiffs fall short of demonstrating a hostile work environment "because they are not discriminatory . . . and because they are insufficiently severe or pervasive to alter the conditions of Plaintiffs' employment."  (ECF No. 33-1 at p. 21.)  As with Plaintiffs' disparate treatment claims, the court finds that Plaintiffs fail to allege facts that would reasonably suggest the conduct described above was motivated by race or sex discrimination.[21]  As an initial matter, none of the alleged facts concerning the above conduct pertains to Plaintiffs' sex as female.

---

[21] The court notes that Plaintiffs support their claims with additional facts and evidence not included in the Complaint or the exhibits that the court may rely upon, presumably in opposition to Defendant's alternative motion for summary judgment, were the court to convert the Motion.  Because the court reviews the Motion under the Rule 12(b)(6) standard, the court does not include these facts or evidence in its analysis.

29

Further, the two alleged incidents that, construed broadly, address race are: (1) Plaintiffs were denied a bonus that their white coworkers were provided; and (2) Plaintiffs were subjected to a racist, discriminatory image (the monkey emoji sent via Teams message to Plaintiffs by Ms. Amparan).

Regarding the monkey emoji, Plaintiffs do not allege they were offended or distraught by the image when it was sent on December 18, 2020; and Ms. Miller allows that she did not notice it at all and only learned about the emoji following the January 2021 meeting at which Ms. Amparan allegedly confirmed she had "an awareness of the discriminatory nature of such an image." (ECF No. 1 ¶ 40.) "Isolated instances of offhand comments from co-workers or biased remarks from a supervisor are not sufficient." *Dobson v. Harnden Grp. LLC*, No. CV JKB-18-3624, 2019 WL 1242527, at *6 (D. Md. Mar. 18, 2019) (holding that "two isolated incidents, six months apart, in which [the plaintiff's] coworkers and a superintendent made race based and biased remarks . . . are not so severe or pervasive as to create an objectively hostile work environment." Thus, this incident, absent more, does not support a claim for hostile work environment based on race. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015) (finding that "a single offensive utterance . . . generally will not create a hostile work environment without significant repetition or an escalation in the harassment's severity . . . [and an] employee will have a reasonable belief that a hostile work environment is occurring if the isolated incident is physically threatening or humiliating.") (internal citation omitted).

Even were the court to find that Plaintiffs had satisfied elements one and two, finding Plaintiffs adequately allege unwelcome harassment as a result of their race or sex, the alleged conduct would still fail to satisfy the third element, because the conduct complained of was not sufficiently severe or pervasive to alter the conditions of Plaintiffs' employment. Plaintiffs do

not allege that any of the alleged conduct was physically threatening, humiliating, or interfered with their ability to do their work.

Plaintiffs also do not adequately address or identify the frequency of the alleged discriminatory conduct on which they base their hostile work environment claim. "'[G]eneral allegations' about a hostile work environment, devoid of 'accounts of specific dates, times or circumstances,' are insufficient to even plausibly allege hostile work environment claim." *O'Connell v. Rahn*, Civ. No. SAG-18-2515, 2020 WL 1929436, at *5 (D. Md. Apr. 21, 2020) (quoting *Carter v. Ball*, 33 F.3d 450, 461–62 (4th Cir. 1994)); *compare Okoli v. City of Baltimore*, 648 F.3d 216, 221 (4th Cir. 2001) (finding a plaintiff had established sufficient frequency of unwelcome or offending conduct where she "suffered upwards of twelve (12) incidents in just four months"), *with Rivera v. Prince William Cnty. Sch. Bd.*, No. 1:09CV341 GBL, 2009 WL 2232746, at *5 (E.D. Va. July 22, 2009) (finding allegations of "four specific instances of alleged harassment within a seventeen-month period" insufficient to allege severe or pervasive harassment). Here, Plaintiffs identify eight instances of alleged harassment, occurring between February 2018 and October 2021, a period spanning more than three and a half years. As most of the alleged conduct was neither continuous nor frequent, the Complaint does not support or permit a reasonable inference of objectively severe or pervasive harassment.

Construing the facts in the light most favorable to Plaintiffs, the court finds the conduct alleged by Plaintiffs, while offensive to Plaintiffs and not conducive to a respectful work environment, fails to meet the "high bar" set forth by the Fourth Circuit required to satisfy the severe or pervasive test and state a hostile work environment claim. *See Green*, 2025 WL 2299432, at *8, *supra*. Accordingly, Counts II and IV of the Complaint will be dismissed.

31

### 3. Retaliation Claims

Finally, as discussed above, Counts V and VI of the Complaint assert claims for retaliation based on Plaintiffs' protected EEO activity for both disparate treatment and hostile work environment. (ECF No. 1 ¶¶ 52–61, 81–89.)

Title VII forbids "retaliation against an employee for opposing adverse actions that she reasonably suspects to be unlawful under Title VII" per 42 U.S.C. § 2000e-3. *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018). As with discrimination claims, a plaintiff "may prove that an employer took action with . . . retaliatory intent through direct evidence or through the burden-shifting framework of *McDonnell Douglas.*" *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327 (4th Cir. 2018). Pursuant to the *McDonnell Douglas* three-step framework, a plaintiff must first establish a *prima facie* case of retaliation. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). To establish a *prima facie* case of retaliation, a plaintiff "must show: '(1) engagement in a protected activity; (2) [an] adverse employment action; and (3) a causal link between the protected activity and the employment action.'" *Barbour v. Garland*, 105 F.4th 579, 589–90 (4th Cir. 2024) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

#### a. Retaliation Claim Based on Disparate Treatment

As with their separate disparate treatment claims, Plaintiffs allege in their retaliation–disparate treatment claim (Count V) that they were subject to adverse employment actions "including, but not limited to . . . discriminatory non-selections" as Acting Branch Chief of their unit, stripping them of their professional duties, and denying them the 2018 CRI Bonus in retaliation for engaging in protected activity. *Id.* ¶ 96.

Again, the parties do not appear to dispute, and the court is satisfied, that Plaintiffs meet the first two elements of the *prima facie* case. Plaintiffs engaged in protected activity when they initiated EEO contact and later filed formal discrimination complaints with the Agency,

and failure to promote, stripping of job responsibilities, and denial of the CRI bonus constitute adverse employment actions. Here, Defendants argue that Plaintiffs fail to meet the third element, establishing a causal link between the protected activity and the adverse action, because Plaintiffs cannot "prove that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." (ECF No. 33-1 at p. 19.) In opposition, Plaintiffs contend they "properly allege that management took tangible employment actions against them because of their engagement in protected activity." (ECF No. 53-1 at p. 44.)

Of consequence here, this court has repeatedly held that "any adverse action that predates [a plaintiff's] first EEO contact cannot form the basis of a retaliation claim." *Diallo v. Noem*, No. 8:24-CV-00421-PX, 2025 WL 712933, at *7 (D. Md. Mar. 5, 2025); *see Short v. Berryhill*, No. CV ELH-18-2714, 2019 WL 4643806, at *20 (D. Md. Sept. 24, 2019) (finding "[a]n adverse action that predates the EEO activity cannot serve as a basis for a retaliation claim based on that EEO activity."); *Hunter v. Vilsack*, No. CIV.A. DKC 07-2655, 2010 WL 1257997, at *11 (D. Md. Mar. 26, 2010) (same).

Here, Defendant argues Plaintiffs' retaliation claim based on disparate treatment (Count V) "fails on its face because the alleged adverse employment actions occurred prior to Plaintiffs' EEO activity." (ECF No. 33-1 at p. 19.) Plaintiffs counter that "Defendant understood that [] Plaintiffs had EEO concerns as early as 2018 when Plaintiffs were raising issues and challenged the denial of being the acting supervisor of their unit in favor of a white employee, challenged the circumstances around stripping of their IPT duties, and raised questions regarding the CRI bonus." (ECF No. 53-1 at p. 46.)

"An employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct." *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) (citing *Richardson v.*

*Richland Cnty. School Dist. No. 1,* 52 F. App'x 615, 617 (4th Cir.2002)); *see Chang Lim v. Azar,* 310 F. Supp. 3d 588, 604 (D. Md. 2018) (holding that "[t]o qualify as protected activity, an employee's complaints must still communicate 'a belief that the employer has engaged in . . . a form of employment discrimination' based on a protected class.") (quoting *Crawford v. Metrop. Gov't of Nashville and Davidson Cty.,* 555 U.S. 271, 276 (2009)). Notably, "generalized complaints against one's supervisor do not constitute protected activity." *Braxton v. Chesapeake Urology Assocs., LLC,* No. 8:23-CV-00213-PX, 2023 WL 8716862, at *5 (D. Md. Dec. 18, 2023) (noting that the plaintiff's underlying complaint failed "to aver any facts suggesting that [the plaintiff] complained about being mistreated *on account of her race*") (emphasis in original).

The court agrees with Defendant with respect to the denial of the CRI bonus. Because the bonus denial between 2018 and 2019 predates Plaintiffs' initial EEO contact (February 1, 2021, as to Ms. Burroughs and February 4, 2021, as to Ms. Miller), it cannot serve as the basis for a retaliation claim. Moreover, despite viewing the allegations most favorably to Plaintiffs, the Complaint fails to allege that any complaints made to their supervisors with regard to denial of the CRI bonus made mention of the fact that Plaintiffs believed they were denied on the basis of their race.

Additionally, Defendant contends the one post-EEO activity underlying this claim (that Plaintiffs were stripped of their duties) fails to plead facts making this claim plausible because the "lapse of two-and-a-half months between the protected activity and an adverse action 'is sufficiently long so as to weaken significantly the inference of causation. . . .'" *Id.* at p. 20 (quoting *Angelini v. Baltimore Police Dep't,* 464 F. Supp. 3d 756, 792 (D. Md. 2020)). The court notes that the alleged failure to promote Plaintiffs to Acting Branch Chief on the basis of race also occurred after their initial EEO contact, on February 26, 2021, when Ms. Valentine was selected for the position, and thereafter, when Ms. DeLapp was selected. (ECF No. 1 ¶¶

34

45, 49.) Thus, the court addresses whether Plaintiffs plausibly plead a causal link between their initial EEO contact and both subsequent adverse actions (the stripping of duties and failure to promote) to support a claim of retaliation.

"Fourth Circuit precedent addressing the causation prong of a *prima facie* case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021) (finding plaintiff failed to establish a *prima facie* claim of retaliation because plaintiff failed to present evidence, either direct or circumstantial, as to whether defendant knew he had been subject to or had complained of harassment when his employment was terminated). "[A] causal connection for purposes of demonstrating a *prima facie* case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Id.* at 126 (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogated on other grounds by Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). As previously explained by this court:

> Causation may be proved through two routes: (1) "the existence of facts that suggest that the adverse action occurred because of the protected activity," and/or (2) "sufficient temporal proximity" between the protected activity and the adverse action. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021) (citations and quotations omitted). Where a plaintiff relies solely on "mere temporal proximity to establish a causal connection between" her protected activity and the adverse action then "the temporal proximity must be very close." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). However, "where temporal proximity between protected activity and allegedly retaliatory conduct is missing," a plaintiff may pursue the first route and point to "evidence of recurring retaliatory animus during the intervening period." *Id.* (citation and quotation omitted). This alone "can be sufficient to satisfy the element of causation." *Id.*

*Yancy v. Becerra*, No. CV DKC 20-0276, 2021 WL 4215332, at *6 (D. Md. Sept. 16, 2021).

Here, drawing all reasonable inferences in favor of Plaintiffs, the court finds that Plaintiffs fail to allege facts to demonstrate a sufficient causal nexus to establish a *prima facie*

claim of retaliation.   While Plaintiffs were both passed over for the Acting Branch Chief promotion after their initial EEO contact in February 2021, Plaintiffs allege they were first passed over for the promotion on October 19, 2020, when Ms. Amparan was selected as Acting Branch Chief over Plaintiffs, prior to initiating EEO contact.  (ECF No. 1 ¶ 32.)  Whereas Plaintiffs were not promoted to Acting Branch Chief prior to initiating EEO contact, the subsequent failure to promote Plaintiffs is not (taken as true) "evidence of recurring retaliatory animus" sufficient to satisfy the element of causation for purposes of pleading a plausible claim.  *Yancy*, 2021 WL 4215332, at *6.

Moreover, the Complaint fails to allege facts suggesting or on which a reasonable inference can be based that Plaintiffs' supervisors were aware that Plaintiffs had initiated EEO contact—either through the February 2021 Pre-Complaint Forms or following their EEO complaints (March 31, 2021, as to Ms. Burroughs; April 6, 2021, as to Ms. Miller)—prior to stripping Plaintiffs' of their duties or failing to promote them.  Thus, regardless of the temporal proximity of either action, supervisor lack of knowledge of Plaintiffs' EEO contacts cannot form the basis of a Title VII retaliation claim.  Accordingly, Count V of the Complaint will be dismissed.

### b.   Retaliatory Hostile Work Environment Claim

While "[r]etaliation claims under Title VII can be based on an employer's retaliatory creation of a hostile work environment[,]" a plaintiff "must show a *prima facie* case for retaliation, including evidence that her employer's adverse actions amount to a hostile work environment." *Fordyce v. Prince George's Cty.*, 43 F. Supp. 3d 537, 552 (D. Md. 2014) (internal citations omitted).  As explained by the Fourth Circuit regarding retaliatory hostile work environment claims:

> [P]laintiff[s] can establish retaliation under this theory as long as the employer's creation of a hostile work environment amounts to a *materially adverse* employment action. 548 U.S. at 68, 126 S.Ct. 2405. Materiality is an objective determination, meaning

36

that "[a]cts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse actions, although a mere inconvenience or an alteration of job responsibilities[ ] will not suffice." *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.,* 595 F.3d 1126, 1133 (10th Cir.2010) (internal quotations omitted).

*Id.* Where, as here, the court previously found Plaintiffs failed to state a plausible claim for hostile work environment, Plaintiffs are unable to establish a claim for retaliatory hostile work environment as set forth above. Accordingly, Count VI of the Complaint will be dismissed.

## IV.    CONCLUSION

For the reasons set forth herein, by separate order, Defendant's Motion, construed as a motion to dismiss, will be granted.

/S/

June 29, 2026

_____
Julie R. Rubin
United States District Judge

37